Ms. Harris. 165854 Christa Gayle Pike v. Gloria Gross Warden. Arguments not to proceed, 15 minutes, 20, 30 minutes preside. Mr. Farrell for appellant. Thank you and may it please the court. My name is Stephen Farrell and I represent petitioner appellant Christa Pike in this appeal from the denial of federal habeas relief. I would ask the court for eight minutes to reserve eight minutes of my time for rebuttal please. You may. Thank you. This court must reverse the district court's denial of relief on the grounds of ineffective assistance of counsel in the penalty phase of Christa Pike's capital trial. This is because even under the facts found by the state court and now advanced by the warden, the finding that counsel's performance was not substandard is unreasonable. Furthermore, the finding that prejudice did not result from this substandard performance is also unreasonable because had the proper mitigation case been presented, there is a reasonable probability that at least one juror would have voted for life in this case. Well, it's not substandard, it's deficient performance. Excuse me, your honor. Yes, it's deficient performance. Thank you. That fell found that counsel's performance was not deficient. Trial counsel hired Dr. Diana McCoy to conduct a mitigation investigation in this case, which was an important step because all counsel recognized that this case would almost surely go to the penalty phase and that the penalty phase, a guilty verdict, was almost a foregone conclusion and that the penalty phase was the most important portion of her trial. Dr. McCoy gathered records and interviewed potential witnesses. Both counsel and Dr. McCoy testified that they communicated frequently about the status of her investigation and what she was finding. She prepared a list of mitigating themes, suggested mitigation witnesses, and also prepared a three-volume compilation of her work product that was labeled the social history. All of this was done and the social history was prepared and copied and given over to the prosecution just before the penalty phase began in anticipation of her being the lead witness in the capital portion of the trial. However, at the last minute, counsel did not call Dr. McCoy. Counsel's reasons for this is that he stated that at the last minute he learned that Dr. McCoy would not corroborate Dr. Ingham, who had testified in the guilt phase of the trial, would not corroborate Dr. Ingham's diagnosis of borderline personality disorder. Thus, under counsel's own testimony, they had to make a last minute change of plans because of what the state court called exigent circumstances of finding out this lack of diagnosis or disagreement about diagnosis at the last minute. This failure to inform themselves about what their own expert witness would testify to is the reason for these... Not having determined this earlier, is that your point? Exactly. Having not informed themselves what their expert was prepared to testify to. And finding that out allegedly at the moment before they were to call her to the stand. This is substandard performance. No competent attorney in a capital case would expect an opinion from an expert and not inform themselves as to what that opinion would be in advance to putting her on the stand. To play it out, would this court need to think what would... In order to evaluate the ineffective assistance claim here on habeas review, does this court need to evaluate keeping in mind what would have been done had counsel known earlier? The dilemma could have been presented earlier, and that's your point. Yes. They could have known, informed themselves. Yes, exactly. But then what? If, for example... What's the point that would have made things different? If they had informed themselves at a point unclear... Two months before. Two months before. Now what? According to the state court, the reason... Experts still don't agree. Hire someone new, what would... It's not necessarily that they didn't agree. What the state trial court found was that she said she couldn't corroborate the diagnosis because he hadn't asked her to do testing. So I think at that point, it would be incumbent upon counsel, if they expected a diagnosis, to tell their expert, we'll do the proper testing, or continue your investigation and we'll be prepared to put Dr. Ingham on in the penalty phase. Because that was Dr. Ingham's diagnosis, but he prepared his report right about the same time she began her background investigation. There was absolutely no intersection of those two parts of the investigation. Certainly if counsel had asked Dr. McCoy well in advance, then she could have either done the testing or recommended a different course that would have allowed expert testimony to be presented in the penalty phase. And so, clearly, and certainly if counsel had informed themselves prior to turning over the social history, they would not have proceeded in that matter. Because all of her work containing all of the witnesses' statements, all of her background investigation was turned over in anticipation for her testimony. This allowed the prosecution to use that information to cross-examine the witnesses. So this is where the deficient performance certainly adheres, and then where we begin to look at the prejudice that resulted from counsel's failure to inform themselves about their own case. And the prejudice, first of all, begins with that aspect of the social history going to the prosecution. Because the prosecution then asked for an overnight recess to go through it, and then clearly used that information in cross-examining the three family members who happened to be present at the trial. The court, again, has to remember that through counsel's own testimony, they said they planned to center their case around Dr. McCoy. No other witnesses were under subpoena, and they were stuck, since they didn't ask for a continuance or any other sort of relief that might have given them a chance, they were stuck with the people who happened to be attending the trial, Krista's mother, her father, and her aunt. And these people were prepared hastily at the last minute and put on the stand. And because the prosecution had gotten copies of the social history, in counsel's own words, they were able to use that to rip up the mitigation witnesses. Is it deficient performance to give the prosecution the social history in the report? Not necessarily, no. Was it deficient to call the family members, or were they not adequately prepared? No, I believe they were not adequately prepared, and that could be deficient performance, but turning over the social history would not be deficient performance if it was to be used to support expert testimony. Now, in this case, the social history... Are you saying because they decided not to call Dr. McCoy, that at that point they should not have given the social history, but the history was given to them before they made the decision not to call? That's their testimony, or everyone's testimony, is that they gave the social history. But that was correct. That was proper conduct of counsel, at least at that time, right? Perhaps. And I say perhaps, Your Honor. You're trying to combine things here. If the social history, just to make one point clear, normally an expert's report must be turned over. That's what I thought the rule was, so it's hard to see how that's deficient. But in this case, the social history had absolutely no expert opinion to qualify it as a report. So counsel had not even verified that the social history, what they believed was a report that they were turning over, which certainly I agree with you, Judge Griffin, that that would obviously have to be turned over, but it didn't even contain her opinion. And counsel wasn't aware of the fact that it didn't contain her opinion until... Much like the civil arena, or am I incorrect that you may hire an expert from which you glean information and you only have to turn over written documentation or testimonial provisions from that expert if you intend to call them at trial? Correct, correct. If they had not intended to call her in sufficient time before the hearing, then they would not have been required to turn those documents over. Correct, correct. They would not have been required to turn over her report. And this happened, the guilt phase ended on a Friday, and the penalty phase was to convene immediately. And they were intending to call Dr. McCoy, and it's at this point that they turned over the materials. If they had turned, if they had called her though, even if they had called other mitigation witnesses, they would have had to turn over her materials, right? Perhaps, yes. But normally that would be in support of an opinion. And that was, as soon as they turned over the opinion, both the trial judge and the prosecution were looking through it saying, we can't figure out what her opinion is. It doesn't appear to be stated here. And at that point, Mr. Tallman said, I don't know either. I can call her and find out. So clearly... I'm sorry, these three volume documents, I understood that that was the social history. Yes. But it was not begun by the actual report and opinion of Dr. McCoy. No. Did that even exist? It seems to be outside of what the rules would require. And that's where, once again, it's difficult to answer questions about what would have had to be turned over and what would have had to be prepared. But normally it should have been a report stating, here's what I've reviewed, and maybe attach those documents and that information, and here's the conclusion that I've reached. It contains no such conclusion, no such opinion. So certainly, had she prepared a report, that would have to be turned over before she testified and given the state an opportunity to look at it and review it to contest it. That didn't happen in this case because there's no opinion in it. And at the moment when they turned it over, everyone in the courtroom is looking for her opinion. Isn't there a feature in this factual scenario that she wasn't asked to give an opinion? She depended on the opinion coming from the other doc. That is her testimony. Mr. Tallman's testimony is that he asked her for an opinion. Mr. Farrell, I'm still trying to figure out your point. Is your point that they turned over the report and they did not have to turn it over? They would have had to turn it over had it contained an opinion. Okay. You say it doesn't have an opinion. So, I mean, what's the whole point of this argument? This is that they turned it over, gave the negative, potentially negative... You're saying they should not have done it? If they weren't calling her as a witness, no, they shouldn't have. Well, okay, if they made a strategic decision late in the game not to call her, but if they wanted to keep that option open, they had to give out the report so many days in advance, I assume, right? Well, there wasn't a hard and fast rule. And their interpretation of the rule is they didn't have to turn it over until they were ready to call her. Like the moment of? Yes. Well, I think that would result in a continuance. They have to have time to review it and everything. Right. And it did, in fact, result in a continuance in this case. An overnight continuance, not any lengthy continuance. Okay. So your point is that because they didn't call her, they didn't have to give the report. The report contained negative information that hurt your client's case, and therefore they should have made the strategic decision not to call the doctor earlier on, and then that way the report wouldn't have come out there and that wouldn't have come in. Yes. And because it came in, it was prejudicial. I think my point is that they had an obligation. If they were going to have an expert witness in the penalty phase, they had to determine what that expert's opinion was and then have her prepare a report with that opinion. It's better if the report doesn't contain the opinion, and then the prosecutor doesn't know what the opinion he's going to be attacking. I think experts should have opinions in their report, and maybe the required do, but I think it actually helps your client if they don't present the opinion and hide it and spring it on them at trial. Under that scenario, and normally the rules do require that the opinion be expressed in the report, but if that had been counsel's strategy, at the same time, it would still be incumbent upon them to know what that opinion is and to know that their expert is prepared to testify to it and support it. Yes, that's very basic law, and certainly this Court has found that in Ritchie v. Bradshaw. But in talking, I mentioned the report because of the prejudice aspect, is now the negative information that many of the family members had expressed about the defendant in this case could now be used by the prosecution, has been given ammunition, and absolutely no expert to give that information any mitigating context. And in fact, the jury, just as in Sears v. Upton where the Supreme Court talked about the problem of the jury being misled, the jury was misled about some of the facts in this case. I bring to the forefront the butcher knife incident where they brought up in the Tennessee Supreme Court, mentioned it in their opinion, that Krista Pike had attacked one of her mothers with a butcher knife because that was contained in Dr. McCoy's materials. The real context of that butcher knife incident was that Krista Pike had indeed gone after one of her mother's boyfriends after this boyfriend had been sexually molesting her, had been, as she put it, feeling her up and pinching her breasts, and her mother would not respond to her complaints about this. Children's Services intervened. Krista called the police at that time. Children's Services intervened and gave the mother a choice. Either the boyfriend goes or we take Krista into custody. But the jury was misled into believing that this was some sort of unprovoked incident against the mother's boyfriend. And there was nobody to discuss the actual context of this, and that's just one example. Without any expert to talk about the effects of the bad parenting, there was no one to talk about the effects of the lack of consistent education for this child, who was, from all testimony, bright and able to do well in school at the beginning, but who went through so many changes being shuffled back from her mother to her father, changed schools nine times before the age of 15 years, that she... Can we step back to this expert report, because I'm struggling with the facts of what happened. Do you have an objection, do you say that it would have been inadequate performance to have just called Dr. McCoy and to have had her testify? Not necessarily. If she had been allowed to testify, that may not have been deficient performance in this case. Any mitigation witness in this case that knew this young woman well enough to know of her problems would have known both sides of the problem. So if you had called that expert, that information would have to have been provided, and the expert would have been subject to cross-examination about the very things that the three individual family members were crossed on. Yes, Your Honor. So is it your position that there was a game plan in place that could have avoided that? Yes, there was a plan in place that was abandoned at the last minute. And we've contested the findings of fact of why counsel chose to do that, but under the findings of fact in the state court, counsel said it was because his expert couldn't corroborate the expert from the guilty phase. And so that's what threw everything into turmoil and created exigent circumstances. I guess my problem is there is then some support for the claim, because that's why he supposedly called back. They all said there's no opinion in here, and so he goes to her and says, I need what your opinion is, and now you're telling me something different. I'm at a loss to understand how he couldn't know what her opinion was. But is this the scenario? His testimony is that she told him her opinion in a little huddle in the courthouse at the moment he was going to call her. And that he hadn't known it before that she said... Not the moment after people contacted him and said you've given us these three volumes of social history, where is the rule? I hate to sound unclear, but the facts and the testimony are very unclear. And our stance or our understanding of this is that Dr. McCoy's testimony is much clearer as to what happened. Mr. Tallman's and Mrs. Rice's testimony doesn't really jive with the actual facts, which is why we think it was unreasonable that the state court found them supported by the record. We think that those state court fact findings are unreasonable. What's the standard there? We presume that to be correct. That's more or less a credibility determination, is it not? In which event, we don't overturn that lightly. In fact, it has to be extreme for us to say that was wrong, we weren't there, and we didn't see their face and all that. And we still say unreasonable to credit the other person, to credit the lawyer over the expert. Yes, this court must look very carefully into the record. We think that we meet that standard, but even if we don't, if trial counsel's testimony is believed and the state findings of fact are accepted, it's per se deficient performance to be ready to put on an expert when you don't know what that expert's opinion is going to be. And then to have to make... The attorney that we've been talking about is presumed, as did the district court, then the attorney planned to call Dr. McCoy. I know there is some concern about when the attorney was provided these three earlier, as opposed to when he gave it, but let's just put that aside as to whether he was accurate or straight up about when he got the material. He gets the material, he's going to put Dr. McCoy on the stand, he turns the material over, all without an expert opinion. And then when he's getting ready to put her on the stand, he huddles with her in the hallway and says, what is your expert opinion about her mental capacity? Let's just assume that happened. And so what's your position on that? When she said, according to his testimony, I can't corroborate Dr. Ingham's testimony, that he had to make, according to the state court, a tough decision in exigent circumstances, but it was his deficient performance that created those exigent circumstances that resulted into an extremely abbreviated misleading mitigation presentation that covers less than 60 pages of testimony, about an hour and a half, by my estimation in the record, of actual testimony in the penalty phase, in a case that clearly depended on the penalty phase, and in which the mitigation investigator had uncovered evidence of sexual abuse of the child, of at least two rape allegations that her family did not believe, did not follow up on, of having her education, not just that it didn't go well, but basically was sabotaged by her parents, who often threatened one to the other, well, I'm going to send you Krista. Well, if you're not doing what I ask, I'm going to send you Krista. And so that she was destined to fail in school. That when she had troubles, based on the sexual abuse and the other, the rejection from her parents, there was no follow-through as far as parenting. And that when children's services began to get involved, that test, excuse me, I'm sorry, my time is up. What part and parcel of those mitigating circumstances was not presented by the three family members? It was the sexual abuse, the involvement of children's services, there was misleading information, given the father said he was a strict disciplinarian, when in fact he was abusing her and left marks from his repeated beatings. There was absolutely nothing positive presented about Krista Pike, even though lots of positive information was available. Things like the butcher knife incident. I'm sorry. Thank you. You have reserved some time, right? Who's next? Mr. Douglas. Mr. Douglas, you may proceed. What's going on? No light? Not yet until he speaks. I apologize, Your Honor, that was my fault. Davie Douglas, on behalf of the respondent. The district court properly denied habeas relief in this case, because it was not objectively unreasonable for the state court to conclude that trial counsel's performance during the mitigation phase of the trial was not deficient. And it was also not objectively unreasonable for the state court to conclude that Petitioner had failed to establish any prejudice. When the Tennessee Court of Criminal Appeals examined the deficiency prong of Strickland, it concluded that trial counsel had multiple reasons for not calling Dr. McCoy, the sum combination of which led to one strategic choice, to leave her off of the stand. Isn't the problem when that decision was made? We have in the record that he was meeting with her, what, 14 or 15 times? Had telephone conversations with her? Must have known that this was the key witness. His initial plan is very reasonable. I need a good expert. I need someone who can make an examination of the whole history. And then I need somebody to explain all of the things that flow from that history, from an expert testimony, her mental illnesses, her personality, borderline personality disorder, all of these things. I can understand that that's a great game plan. You don't bring in anybody else who knew all the other difficulties, and you just go right through, you march through the medical evidence and let this expert draw from that three-volume social history. To have arranged all that, to have employed and paid for all that, to have spoken with her multiple times on the telephone, to have met with her 14 times, how could a competent counsel not have said to her, what is your position to a reasonable degree of medical certainty about this woman's mental capacity and her emotional capacity? What trial counsel testified to was that based on all of those conversations that he did have with Dr. McCoy, he was under the full impression and belief that she was going to corroborate Dr. Ingram's diagnosis. She'd never given him any indication that she disagreed with the diagnosis or that she couldn't corroborate it. And that was even something... in the way we're talking about here in the penalty phase, but that was part of the evidentiary basis for their penalty decision. Yes, Your Honor, it was. And the jury was even instructed, too, that it could consider all of the evidence that was presented during the guilt phase, which included Dr. Ingram's diagnosis. But going back to your question, Judge Stranch, Dr. McCoy had said, for example, in her mitigation themes letter that she sent to trial counsel, that one of the biggest themes was borderline personality disorder. So based on all of these communications, trial counsel had every reason to believe that she agreed with the diagnosis and would be able to confirm it. I am at a loss as to how trial counsel would not have looked her in the eye and said, what is your medical opinion on this and how will you testify about that? I mean, did he prepare her for testimony? How could he not have asked her about what her medical opinion is? He's about to put her on the stand. Certainly. And looking back through the lens of 2020 hindsight, there are some different questions that trial counsel could have asked Dr. McCoy, but that's not... Yeah, but he did have reason to believe that she would agree, because the report said borderline, you know, it didn't give any indication she would, I think, I gather, that it's in there enough for the 2020 hindsight is something else. But he had maybe some reasonable grounds to presume, and that's... Is that deficient? No. He had grounds for it, maybe. Yes, Your Honor, that's absolutely correct. He absolutely had grounds to believe that... Where are his written grounds? Where is the writing from her that an expert hired to testify in one of these cases would render to the attorney who's going to ask her questions? Where is her report? Her report was introduced in evidence at the post-conviction hearing. It was not, obviously, introduced during the trial, but that was the three-volume social history. And then the other... And did her report that was admitted at the post-conviction hearing say that she could not support Dr. Ingham's testimony? No, Your Honor, it did not. How could this attorney not place that report in evidence when he's talking in the hallway after all these years of working with her and says, how are you going to testify as to this? How could a competent attorney not already know? He had her report. He knew what her testimony was going to be. How could he not know? Your Honor, that, I think, goes again to what the Court of Criminal Appeals pointed out was a discrepancy between the testimonies of Dr. McCoy and trial counsel. And all of trial counsel's testimony indicated that he did know what Dr. McCoy's opinion would be. It would be that Petitioner suffered from borderline... This is not just a question of, I was kind of surprised when she told me a secret in the hallway. This is a question of, he had her report. He knew what she was going to testify to. And you're saying that he understood that to mean that she was going to testify about supporting Dr. Ingham's testimony. And so he has that, and then he has to ask her for the first time in the hallway, where are you on Dr. Ingham's testimony, and he doesn't know what her report says about that? Your Honor, I think what his testimony was was that he was in the huddle with all of the defense team and was going through a plan of how he was going to present the mitigating evidence. He said, first I'll call you, then you'll corroborate Dr. Ingham's diagnosis. And that's when Dr. McCoy suddenly announced that she couldn't corroborate the diagnosis. You're not here arguing that this was superb trial practice. That's not your requirement, is it? No, Your Honor. So admit it for Judge Strange, that that was not the best way to go, for sure. It certainly was not the best way to go. Mistakes, right? He should have known, right? But he didn't know. Now, what's the issue here? The issue is that he had several reasons for not calling Dr. McCoy, and ultimately that decision was an informed decision. It was not an example of trial counsel failing to conduct any type of a mitigation investigation. That's the important issue, is that he had something to say about this conversation right before she was put on the stand. But how could a competent, we're talking about sufficiency of performance, counsel who knows her life hangs in the balance at this mitigation stage, not already have reviewed and known what the report said? I'm not convinced that you can say it's reasonable trial strategy to find yourself in a corner and make a poor but maybe acceptable decision. If you yourself backed yourself into that corner, if you created the problem, then you failed earlier in your representation. And it's not an excuse that I didn't know what to do at the last minute, because he should have long known what to do. Is malpractice different than deficient performance, the question before us today? I mean, say it's malpractice. In a civil case, you could have gotten damages, probably. Yes, Your Honor. Possibly. The standards are different. So talk about the difference. Why isn't Judge Stranch's point just perfectly right, in that it shows this was deficient performance and prejudice follows as a matter of course? Because looking at just the last minute announcement of Dr. McCoy doesn't take into consideration all of the other work that trial counsel did to investigate this case and to prepare the mitigation phase of this case. And all of that work did not rise to the level of being objectively unreasonable. It didn't fall below. I would agree with you. All of that early work was adequate performance. But then he didn't use it. He had already given them all the ammunition they needed to destroy the witnesses that testified, and he did not give himself or Krista Pike the ammunition to defend that position, because he chose not to put this person on. And I'm struggling with how he could not have known that and rendered adequate performance. I find it really difficult to understand how backing himself into this corner and not knowing what her professional opinion was when he had planned her to be the only witness can be acceptable and sufficient performance. In answering that, would you remind us what the other reviewing courts found in that regard with regard to that very thing? They seem to think it didn't meet the Strickland standard. The reviewing courts looking at it, the Court of Criminal Appeals noted that trial counsel's decision was reasonable at the time based on a combination of factors, that Dr. McCoy's announcement was not the sole reason that he chose not to call her as a witness. The Court of Criminal Appeals pointed out that that was simply the final straw for trial counsel. Go back through the other straws, because he would have then known them all the walk-up to the time that he left her as the only witness he planned to call. Certainly, Your Honor. The first straw for trial counsel was Dr. McCoy's admission shortly before trial started that she had been in a proromantic relationship with the chief prosecutor in the case. And trial counsel testified that Dr. McCoy did not disclose that relationship specifically because she was afraid that it would cause trial counsel not to retain her for the case. So while he kept her on, he was still very uncomfortable with the idea that this relationship had existed. The second straw for trial counsel was the fact that Dr. McCoy would come up in the trial and come up to bite him, I assume. If that's disclosed in the trial one way or another. It's a risk, and he was unsure of how that relationship had been resolved between the two of them, if that would somehow impact her potential testimony, I believe. What was the date he found out about that relationship? He did not pinpoint a specific date, but both he and co-counsel testified that they learned about it either just prior to trial or possibly during trial. But it was something that came up. Just prior to the guilt phase? Yes, Your Honor, just prior to the guilt phase. How long was the guilt? The guilt phase was, I believe, about two weeks. And the second straw for trial counsel was an interview that Dr. McCoy gave during jury selection. She talked to a local television station, and trial counsel called her after seeing the interview and said that he felt uncomfortable with a member of the defense team giving interviews and talking about a case in which they were an active participant. And the third straw for trial counsel was the significant amount of negative information that was contained in Dr. McCoy's report. When trial counsel read it, he was afraid that even if there was a psychological explanation presented to the jury about the petitioner's prior behavior, that the jury would ignore that explanation and focus instead only on her prior bad acts. What had they been talking about? I'm struggling to understand how he was not aware of this when he had been calling with her routinely and meeting with her 14 times. Surely he understood what she was determining and finding out in this three-volume set of documents, right? Yes, Your Honor. He got them on the 20th, wasn't it the 20th, and then gave them to opposing counsel the night before, resulting in a continuance. So he had had them for at least four days prior to actually turning them over. Yes, Your Honor. And what was his responsibility during those four days to determine whether he was going to call her or not, or even ask for a continuance? I believe his responsibility was to review the documents, which he did, and he said that after reviewing all of them, he felt that the prejudicial, the potential prejudicial value, or the potential prejudice of the negative information about Petitioner outweighed any probative value. So that was... What was the date of the experts interviewing of these people that resulted in the three-volume? They were several, it was multiple interviews conducted over the course of six months. For example, she spoke, I think, nine different times with Petitioner. Over six months? Yes, Your Honor, I believe that... So he had had information from her in his 14 face-to-face meetings with her regarding what she was finding out, both from Petitioner and from these other witnesses, correct? Possibly. He said that Dr. McCoy never gave him a play-by-play, for example, of everything she was discovering, but it certainly is reasonable to believe that trial counsel knew at least some of this negative information. Is it reasonable to expect that trial counsel would ask her, ask his expert, what are the witnesses saying? What are you finding out about Krista Pike? What is your medical opinion? And that's what he hired her for, right? Correct, Your Honor. And the indication is we're down the night before those questions come up. I've got to ask you as an attorney, can that possibly be competent counsel? Your Honor, again, there were some different questions that trial counsel could have asked Dr. McCoy, but looking at his entire performance, it does not fall below an objective standard of reasonableness because he made an informed decision based on his investigation at the time. Talking about that one feature, and maybe we can step back for a moment and speak about the prejudice. Certainly. This was a client that would be very, very difficult to come up with a defense. Yes, Your Honor. Given what the jury heard in the guilt phase, counsel was doing yeoman's work to try to, and he was probably appointed, trying to do his best for this client. So our job here at this level, now that the district court and the courts of appeals have decided, our job is to look at the aggravation as a whole weighed against the totality of mitigation that was available at the time. So the situation with changing experts, there are four reasons. Apparently the appellate courts and the state accredited those rationales and ended up deciding that the performance was not deficient, I think, both, and that even if it had been, there was no reasonable probability that weighing both against one another that the culpability determination by the jury could have been affected, I think, generally speaking. So could you address that aspect? If all the best mitigation had been presented, and really it all boiled down to there was a reason why this woman had acted the way she had, it was her dreadful, dreadful upbringing, right? And it could also be the personality disorder that was brought into evidence, correct? I mean, that had to have a bearing. Talk about that. Council gives us a good argument here that all it had to do was affect one juror. It has to be unanimous, right? So what's your best argument about that? That the Court of Criminal Appeals considered all of the additional mitigating evidence that was not presented in trial, and they determined that... That would have been the later expert, the post, right? The post-penalty, later interviewed and came up with the report. Okay, so that's some of the evidence the Court of Appeals looked at. They looked at all of it. They looked at every single piece of evidence that was presented and is now being raised on this habeas appeal. The Court looked at all of it and determined that there was not a reasonable probability that but for trial counsel's failure to present this evidence, that one member of the jury would have concluded that the mitigating factors outweighed the aggravating factors and did not warrant a sentence of death. The jury found two enhancement factors in this case. The first was that the murder was committed in an especially heinous or atrocious manner. The facts speak for themselves in regard to this enhancement factor. The second enhancement factor that the jury found was that the murder was committed to avoid the lawful arrest of the defendant or of another party. And there were petitioner's own statements in her confession to police that she heard voices telling her that she needed to do something with the victim to ensure that she did not get reported and then arrested for attempted murder. So in light of the overwhelming evidence, as the Tennessee Supreme Court called it, of these aggravating factors, it was reasonable for the state court to conclude that the failure to present any additional mitigating evidence would not have created a reasonable probability of affecting the outcome of sentencing. Under Tennessee law, how are jurors, how is a jury to think about the aggravating and mitigating, how do heinous and atrocious, these extra factors, what are they called, aggravating, how are those factors to be considered in the whole picture? I don't know quite how that works. They're all to be considered cumulatively. For example, the aggravating factors are all considered and then weighed against all of the mitigating evidence. And here, even though there was new additional mitigating evidence presented during the post-conviction proceedings, it was largely cumulative of the evidence that was presented during trial. And in order to establish prejudice, the new evidence has to differ substantially. Mitigating that would have come in or did come in, even considering the post, they were allowed to consider that too? The expert testimony that didn't get presented at the guilt phase or even the penalty phase, but did come to the jury's attention later, really? They get to consider that which the trial counsel hadn't presented in the penalty phase? They weigh the evidence that was not, I believe I also may have misunderstood your first question and I apologize for that, were you talking about how the post-conviction court considers the mitigating evidence or how the jury at trial? I am considering that there's evidence from post-conviction that the expert did some examination of her, all the things we're talking about, and presented that in a report that was or was not considered by the jury. The report was not considered by the jury? That's all post-conviction, okay. That's for appellate courts. Is your position that even if, when you had all of the information that came in post-conviction, even if we determined that the representation was in fact ineffective, that you think that no matter what, this case does not qualify for prejudice? Yes, Your Honor. And what is the strongest basis for that conclusion? The simply overwhelming evidence of the aggravating factors and that evidence coupled with the fact that the mitigation evidence presented was largely cumulative of the evidence that was presented at trial. The jury heard about Petitioner's difficult childhood. They heard about the physical, emotional, and psychological abuse that she suffered. They heard how she was rejected by both of her parents. I asked Mr. Farrell that question, and he said that Dr. McCoy would have presented additional mitigation evidence that did not come in otherwise, and that because Dr. McCoy wasn't called, that there was other mitigation evidence that the jury was not advised of. How do you respond to that? That again, it was just more evidence of her difficult childhood, but the jury was already aware that she did not have the easiest of childhoods. This was not a case where the jury had no... Would it just strengthen the claims that are already in front of the jury as to this and that? Yes, Your Honor, exactly. It would have just provided, again, more support for evidence that was... All right. Your defense to their claim of ineffective assistance to counsel, it's a double deference under Strickland on the habeas review, but you claim that the representation was not deficient, and two, it was not prejudicial. Would you concede that the not prejudicial defense is a little stronger than the deficient performance defense, or do you think they're equally as strong? I think that under the deferential standard of AEDPA that... You went on both, but I'm just saying is one stronger than the other one or not? Your Honor, I believe that both are strong and that there is a state court decision that is entitled to deference. Unless it's an unreasonable interpretation of the facts of the law. Yes. All right. You won't concede to me. I think your prejudice defense is a little better than the other one, but okay. All right. That's okay. The prejudice defense likely has more strength than the deficient performance. I mean, you win either way if we rule one way or the other. I'm not going to concede to the state court because it was not an unreasonable application of Strickland for the state court to conclude that trial counsel was not ineffective. Thank you. Mr. Peril. Thank you, Your Honors. Certainly Krista Pike was prejudiced by counsel's deficient performance, and things were left out of the penalty phase. As I mentioned earlier, there was no evidence presented about the sexual abuse that she suffered. There was evidence that Dr. McCoy gathered that she was... How do we assess that that would have made a difference in this horrid upbringing? I think you have to look at it the way the jury would have looked at it. And certainly they looked at the aggravating circumstances. That was the state's case, and it was presented. And now the defense had their opportunity, and they completely blew it. And you've got to look at what the jury could have heard and could have considered. What would they have not heard that would move them much better had they heard it? It's the sexual abuse. That's one. Was the sexual abuse proven, or was that just an allegation? I wasn't quite sure. There were allegations. The problem, as in many cases of sexual abuse, unfortunately, are that they weren't well explored at the time, and Krista was not believed. I mean, if they're mere allegations without supporting proof, could they have been objected to and not actually been admitted at the penalty phase? The fact that she made those allegations, there was evidence of it. It would prove the fact that she told her parents that she was sexually molested. They didn't believe her. She attempted to commit suicide. And one of the aspects that this Court has found in finding prejudice is were certain allegations corroborated. Dr. McCoy had gathered medical records to corroborate these allegations. Perhaps they didn't corroborate that she was sexually molested, but they corroborated that there was an event that she told her mother about. Her mother didn't believe her. She attempted suicide. Those facts are corroborated. It was corroborated with her school records how many times, just how many times she was shuffled back and forth from her parents, and how in first grade she was starting to do well scholastically, but was drawing inappropriate sexual pictures, suggesting, without proving, that she was either molested or exposed inappropriately to sexual situations she shouldn't have been. Furthermore, the jury was misled about certain of her actions and how she was rebellious. Well, certainly she was rebellious. But an expert can put some context when a nine-year-old child is acting up. It's probably not fully the nine-year-old child's fault. Certainly it could happen in the best of homes, but here we had something that was clearly not the best of homes. On the other hand, counsel, honestly, do we expect that jurors are holding behavior of a nine-year-old weighing in terms of an aggravating factor? When they're instructed to, yes, and when the defendant in this case is only 18 years old, yes, I think that they are. And I think that there's a reasonable probability that in this case they would have weighed that, especially if they had had something to weigh against. This was an 18-year-old girl who suffered from severe mental illness and brain damage, as testified to in post-conviction. Those are serious mitigating factors, and I call this Court's attention to Sears v. Upton from the United States Supreme Court, which was a rape-kidnapping that traveled over three states, and some mitigation was presented. The United States Supreme Court said we can't exclude a finding of prejudice just because some mitigation was presented. We find that the jury in this case presented a picture that wasn't accurate, that significant facts of this person's life were left out, and that that could have made a difference in a case with extreme aggravation. Is that the standard could have? Yes, and that's what the Supreme Court found, that there was a reason. A reasonably probable is a higher standard than could have. Yes, I misspoke, Your Honor. I apologize, but the Supreme Court found that in Sears v. Upton there was a reasonable probability of a different outcome, despite the fact that there were some pretty severe aggravating circumstances. Aggravating circumstances in Wiggins were the attack of an elderly woman who was drowned in her bathtub, and yet the court, relying significantly on the fact that counsel failed to uncover evidence of the defendant's history of sexual abuse and highlighted that sexual abuse, found that there was a reasonable probability that the jury could have come to a different outcome. It is possible in this case, and in fact, given her age... There's a reasonable probability. I'll never do that again wrong, I don't think. You just did it, though. Sorry about that. In this case, what could have been, there are many scenarios that possibly could have been, but counsel, through their own lack of preparation, cut themselves off from a very rich mitigating case. And in fact, another aspect that would have been significant is that Dr. McCoy advised defense counsel to bring in the social workers and juvenile justice workers from North Carolina, who all testified in post-conviction that they were willing to come testify, because they had seen the tragic situation this girl was in. They had tried to intervene. They wanted to, and they saw positive things. They saw potential. And that's really the tragedy of this case. In addition to the tragedy that took place is that had something else happened... Isn't the bottom line of this case the facts of this murder are so horrific that the aggravating factors are just off the charts? It's one of the worst murders I've ever seen. All capital cases should have bad aggravating circumstances. This is just horrible, horrible, horrible. I recognize that. The mitigating factors, even if you add on a few more, how do you get the jury not to impose, recommend the death penalty on this when the facts are so horrific? One of the things that you do also is explain how those bad facts came about through her mental illness and the history through some disinterested witnesses as well. I think the jury would do that if you just added a little bit more of sexual abuse, a little bit more of this, a little bit more of that. That would really have tipped the scales. I guess that's your argument. It's kind of hard for me to see, just because of the facts of this thing. There are no automatic death penalty cases. And had this happened a few months earlier when she wasn't 18, then the mitigating factor of age would have weighed so heavily that the death penalty is excluded. And so the age in this case would have weighed very heavily. The fact that disinterested witnesses would have talked about how she had a history of being unable to control her rage would also have weighed heavily and corroborated in the expert mental health testimony. There is no automatic death penalty in this country, no matter how bad the facts are. And I encourage this Court to review the facts in cases the Supreme Court has found a reasonable probability. With more than one victim, horrific facts, it happens. And in this case, it could have happened. There's a reasonable probability it might have happened. Had counsel... It would have happened in this case. Yes. Yes, Your Honor. Yes, Your Honor. Correct. Yes, Your Honor. Thank you, Your Honors. We ask that you reverse. Thank you.